## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JAMES CROSBY,** | ) |
| **JIMMIE GARDNER, and** | ) |
| **WILLIE L. (OMAR) SMITH,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  **CIVIL ACTION NO. 04-0144-CG-M** |
| | ) |
| | ) |
| **MOBILE COUNTY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the court on the motion of defendant, Mobile County Commission, which

purports to be incorrectly named as Mobile County, for summary judgment (Doc. 53), the motion of

defendants Jack Tillman and Mark Barlow for summary judgment (Doc. 56),  plaintiffs' response to

both motions (Doc. 64), the reply of Mobile County Commission (Doc. 67) and Jack Barlow and Jack

Tillman's reply (Doc. 68).   The court finds that the actions of the Sheriff and Captain Barlow do not

constitute County policy.  The court further finds that Mobile County and Sheriff Tillman are not joint

employers under Title VII.  Therefore, summary judgment is due to be granted in favor of Mobile

County Commission.  The court also finds that James Crosby has not demonstrated a prima facie case

of retaliation or shown that the defendants' proffered legitimate, non-discriminatory reasons for their

actions were merely pretext.  Thus, summary judgment is due to be Granted in favor of defendants as

to all of James Crosby's claims.  The court finds that Jimmie Gardner has not shown that defendants'

non-discriminatory reasons for the employment actions that he alleges were retaliatory, were merely

pretext.  Nor does the court find that Gardner has established that a hostile work environment exists.  Thus, summary judgment is due to be granted as to Gardner's claim of retaliation and hostile work environment.  However, the court finds that Gardner has demonstrated a <u>prima</u> <u>facie</u> case and shown pretext as to Gardner's claim of discriminatory failure to promote.  Thus, summary judgment is due to be denied as to Gardner's claim of discriminatory failure to promote.  Finally, as to Willie Smith's claims of retaliation and discrimination, the court finds he has neither established a <u>prima</u> <u>facie</u> case, nor shown pretext.  Thus, summary judgment is due to be granted in favor of defendants as to all of Smith's claims.  The court further finds it unclear what claims remain against the Mobile County Personnel Board.  That defendant is identified in the complaint as being included as a "necessary party."  As such, the court will order the plaintiffs to clarify their claims against the Personnel Board.

## BACKGROUND

This case was filed by three individuals, James Crosby, Jimmie Gardner, and Willie (Omar) Smith, asserting violations of 42 U.S.C. §§ 1981 and 1983, and Title VII of the Civil Rights Act of 1964.  Their claims arise from their employment with the Sheriff's Department of Mobile County.  They assert claims against Mobile County Commission, Sheriff Jack Tillman in his official capacity, Chief Deputy Mark Barlow in his individual and official capacity, and the Mobile County Personnel Board.  The court previously found that Sheriff Jack Tillman is immune from all claims for monetary damages asserted against him in his official capacity.  (Doc. 42).

## JAMES CROSBY FACTS

Crosby's complaint is one of retaliation for his participation in protected activity.  Crosby began employment with the Mobile County Sheriff's Office as a Deputy in 1983. (Crosby depo p. 9).

Crosby was promoted Corporal, Sergeant, Lieutenant, and ultimately to Captain in March 2000. (Crosby depo. pp. 15-19). Crosby was initially assigned as Captain over the criminal investigation division (CID). (Crosby depo p. 20). The Sheriff's Department was restructured and Crosby became Captain over Field Operations. (Crosby depo. p. 20). In addition to Crosby's Captain responsibilities, Crosby served as interim Chief Deputy from October 2001 until March 2002, when Chief Deputy Mark Barlow was hired. (Crosby pp. 24, 33). Crosby then reported directly to Mark Barlow. (Crosby p. 93).

Crosby was subpoenaed to give a deposition in a civil case filed against the Sheriff in April 2003. (Crosby depo pp. 49-50). Crosby was concerned that if he testified truthfully that he would be retaliated against, and he expressed his fears at the deposition. (Crosby depo. pp. 52-54). At the deposition, Crosby testified that he had heard Sheriff Tillman use racial slurs and derogatory language on several occasions. (Crosby depo in Todd case pp. 13-15). According to Crosby, Sheriff Tillman would not speak to him for about a month after the deposition. (Crosby depo. pp. 61-62). Then in May 2003 he was transferred to Captain over the Support Services Division. (Crosby depo. p. 23). Barlow reports that he transferred Crosby because he felt Crosby did not communicate well with him and was resistant to changes he was trying to implement. (Barlow depo. p. 61-63). Barlow states that there was nothing wrong  with Crosby's performance, but believes there was a communication problem which hindered their working relationship. (Barlow depo. pp 59-60). According to Barlow, the transfer made sense because the current Support Services Captain requested a transfer to Field Services and got along well with Chief Barlow, and because Crosby had experience in the civil division, was considering retirement, and got along well with Chief Barbour, who was over Support Services.

3

(Barlow depo. pp. 54-64).

While over Field Operations, Crosby had managed approximately 90-95 sworn deputies, compared to the approximately 36 sworn deputies in Support Services. (Crosby depo. pp. 16, 37). Crosby's new office was smaller and had no window. (Complaint ¶ 12 ). The office was the same office occupied by the previous Support Services Captain. (Crosby depo. pp. 87, 92). Unlike the position in Field Operations, the new position did not include a secretary. (Crosby depo. p. 95). Crosby also claims that there was less overtime available in the new position. (Crosby depo. pp. 96-97, 205-206).

In June 2003, upon Crosby's request, Sheriff Tillman wrote a letter of recommendation to the Mayor of Daphne on behalf of Crosby (Crosby depo. Ex. 5). Crosby made it known that he was looking for opportunities outside the Sheriff's office and that if he found something more lucrative, he would retire from the Sheriff's office. (Crosby depo pp. 46-47, 72, 77, 125, 127).

Crosby believes that after he assumed the new position,  the chain of command was not properly followed and officers would circumvent him and go straight to Chief Barbour. (Crosby depo. pp. 100-103). Crosby was also no longer allowed to attend the chief deputy's meeting. (Crosby depo. pp. 111-112, 160). Crosby was also told not to attend weekly staff meetings. (Crosby depo. pp. 117-18). Crosby felt that he was being isolated from other aspects of his employment (Crosby depo. pp. 139-141). Chief Barbour advised Crosby that if he had to speak to anyone upstairs, please call them by phone. (Crosby depo. p. 160). Crosby also claims that his unmarked sheriff's vehicle was then replaced with a higher mileage, marked vehicle. (Crosby depo. pp. 170-72). In March 2004, Barbour gave Crosby a performance review which stated that Crosby "continuously exceeds job

4

requirements and behavior, and exemplifies superior levels of performance." (Crosby depo. Ex. 7). The review further stated that Crosby performance was "outstanding" and that "he is a seasoned professional, who is an asset to the division." (Crosby depo. Ex. 7).  Crosby filed an EEOC charge against Sheriff Tillman on October 8, 2003.  Crosby retired August 20, 2004. (Crosby depo. pp. 199-200).  Crosby's duties as Captain over Support Services are now being performed by a lieutenant. (Barbour depo. p. 30).

## JIMMIE GARDNER FACTS

Plaintiff Jimmie Gardner, an African American,  began working at the Metro Jail in 1990. (Gardner depo. pp. 49-50).  During his employment with the Sheriff's Office, Gardner was transferred several times and held positions with the Patrol Division, Civil Division, Roving Enforcement Against Criminal Threat Unit (REACT), the Criminal Investigation Division (CID), and the Internal Affairs Department. (Gardner depo pp. 50 - 56).  He was promoted to Corporal on April 10, 2000. (Gardner depo pp 64-65).  Tillman selected Gardner for Deputy of the year for the years 2000-2001. (Gardner depo. p. 66, Ex. 13).  Gardner also received an accommodation for outstanding service in May 2001. (Gardner depo. p. 67, Ex. 14). On August 14, 2003, Gardner filed a grievance against Sheriff Tillman alleging racial discrimination. (Gardner depo. p. 108).

Around the end of September or beginning of October 2003, Captain Bruce Lee learned that Gardner had been tape recording his co-workers and prepared a memorandum requesting disciplinary action against Gardner. (Lee depo. p. 30, Ex. 2). Gardner was investigated and suspended for taping fellow officers without their knowledge (Gardner depo. p. 157-159).  A pre-disciplinary hearing was held in October 2003 concerning the incident.  The trial board found Gardner guilty of conduct

5

unbecoming of an employee in the public service in violation of a lawful order or reasonable regulation. Gardner appealed his suspension to the Mobile County Personnel Board.  The Mobile County Personnel Board upheld the findings of the trial board, but modified the suspension from 15 days to 5 days. (Gardner depo. pp. 253-254, Ex. 21; Beaman depo. Ex. 2). Other officers, such as Lawrence Battiste, have secretly taped co-workers.

After Gardner's suspension, he was transferred from CID to patrol (Gardner depo. p. 160). According to CID Captain Lee, Lee knew Gardner was unhappy at work and had discussed the problem with Lieutenant Battiste, an African-American, and concluded the best thing for Gardner would be to transfer Gardner to Battiste's patrol division.  Gardner receives the same salary, but claims he has less responsibility and less opportunity for overtime. (Gardner depo. pp. 245-47).

Gardner has also been denied numerous promotions to the rank of Sergeant. (Gardner depo. p. 160).  On December 1, 2003, Gardner's name was on a Certificate of Eligibles sent to the Sheriff's Office. At that time four of the officers on the list were promoted to Sergeant, all of whom were higher on the list than Gardner, and one of whom was African-American. (Gardner depo. Ex. 5).  On December 30, 2003, another Certificate of Eligibles with Gardner's name on it was submitted to the Sheriff's Office.  Three officers from that list, all listed higher than Gardner, were promoted on January 17, 2004.  (Gardner depo. Ex. 6).   On January 23, 2004, a Certificate of Eligibles with Gardner's name on it was again submitted to the Sheriff's office.  One officer on the list was promoted.  That officer was higher on the list than Gardner. (Gardner depo. Ex. 7).  On February 12, 2004, a Certification of Eligibles with Gardner's name on it was submitted to the Sheriff's Office, and one officer from the list, Joe Franklin, who is an African-American, was promoted to Sergeant. (Gardner

6

depo. Ex. 8).  On May 11, 2004, a Certification of Eligibles with Gardner's name on it was submitted

to the Sheriff's office and one more officer, William Stringer, was promoted to Sergeant. (Gardner

depo. Ex. 9).  Both Franklin and Stringer were rated below Gardner on the Certifications of Eligibles.

On October 9, 2004, two more lower-rated candidates, Charles Bailey and Steven Hale, were

promoted to Sergeant. (Barlow depo. p. 125). When asked for input on candidates for promotion,

Captain Lee recommended that Gardner not be promoted for a year following  his discipline. (Lee

depo. pp. 81-82).  To Gardner's knowledge, no person promoted to Sergeant has been suspended

within the 12 months preceding their promotion. (Gardner depo. pp. 254-256).  Grant Chambless, a

white male who was promoted to Sergeant, was the subject of a citizen complaint, but had no trial

board and his only discipline was that his probationary period following his promotion was extended.

(Lee depo. pp. 66-74).   On October 10, 2003, Gardner filed a charge of discrimination with the

EEOC.  On January 6, 2004, Gardner amended his charge of discrimination.  Neither the original nor

the amended EEOC charge asserted a claim for failure to promote.

Gardner also claims that he was treated differently when he requested light duty work due to a

medical problem.  Gardner was assigned to light duty during the night shift, although another employee

had been assigned a day time shift for light duty work. (Gardner depo. pp. 161-72).   Gardner was

working the night shift at the time he requested light duty work.  (Gardner depo. p. 164).

According to Gardner, while he was assigned to REACT, Sheriff Tillman referred to a black

male citizen as "just another dumb-ass nigger." (Gardner Interrogatory #5).  In November 2002, while

Gardner was assigned to CID, Tillman allegedly told him, "I'll get you niggers later." (Gardner

Interrogatory #5).  In August 2003, Tillman allegedly told others that he had placed a confederate

sticker on the back of a black man's car and the man rode around with the sticker on the back of his car all day.  The Sheriff then laughed and walked out of the building.  (Gardner Interrogatory #5). Crosby also testified that several times he heard Tillman use inappropriate language by referring to African-Americans as "niggers." (Crosby depo. pp. 13-14).  Gardner claims his supervisor, Sergeant Mitch McCrae, has used the word "nigger" in his presence. (Gardner depo. p. 92).

### WILLIE (OMAR) SMITH FACTS

Smith, an African American Correctional Officer holding the rank of Captain, alleges in the complaint that Sheriff Tillman transferred him from his position as Warden of the minimum-security jail facility shortly after Tillman entered into a settlement agreement with him concerning a previous lawsuit claiming racial discrimination.  The decision to transfer Smith was made by Warden Haley, who believed Smith would be a good fit in administration. (Haley depo. pp. 39-40).  The person who now holds Smith's previous position is a Lieutenant. (Haley depo. p. 13).

Smith also alleges that, after testifying at a deposition in a prior discrimination suit,  his Sheriff's Department vehicle was taken from him.  According to Chief Barbour, Smith's vehicle was reassigned because Smith was not on call 24 hours a day  and did not need a vehicle. (Barbour depo. p. 98).  The reassignment of Smith's vehicle in May 2000 was the subject of Smith's previous lawsuit, CV-02-0144-BH-L. (Smith Interrogatory #12).  The claims asserted in Smith's previous lawsuit were settled at a mediation. (Tillman depo. p. 23).  Under the terms of the settlement, Smith was to receive  the second Deputy Warden slot if two Deputy Warden slots were approved by the Personnel Board. (Tillman depo. pp. 23-26).   Smith was also to receive a minimum annual raise of $10,000. (Tillman depo pp. 23-26).  Smith received a promotion, but his raise was less than $5,000. (Tillman depo. pp.

33-34).   For a Deputy to receive a raise or a promotion, the County Commission must approve the action. (Pafenbach depo. pp. 23-24).   A person who is promoted  can never receive more than a 10% pay increase. (Weekley depo. p. 41).   The only way to change the increase in Smith's salary when he was promoted to Captain, would have been to revise the pay scale which would effect that entire classification. (Weekley depo. p. 58).   At the time of Smith's deposition in this case, he was the third-ranking person at the Metro Jail. (Ex.31).   Smith has not been assigned a county owned vehicle (Smith Interrogatory #1). Smith has no responsibilities that require him to come to the jail after hours. (Haley depo. pp. 42-43).   Smith is the only Captain in Corrections. (Haley depo. p. 72). The Sheriff's Office has a shortage of vehicles and has been unable to provide vehicles to everyone that needs one. (Barbour depo. p. 99).   The previous Captain of Corrections had a vehicle, however, the previous Captain also acted as Deputy Warden. (Barbour depo. p. 99).   Currently, there is a Deputy Warden in Corrections who has a vehicle. (Barbour depo. p. 99).

### SHERIFF'S DEPARTMENT FACTS

Sheriff Tillman makes the final decision on employee promotions and Chief Barlow offers the sheriff verbal recommendations on candidates. (Barlow depo. pp. 31-32).   Barlow has some input on assignments, reassignments and transfers within the department. (Barlow depo. pp. 28-29).   Chief Barbour is in charge of the assignment of vehicles. (Barlow depo. p. 34, Barbour depo. p. 19).

For a deputy to be promoted, the County Commission must approve the promotion. (Pafenbach depo. p. 24).   The Mobile County Personnel Board has developed a system of rating eligible candidates for promotion within the Mobile County Sheriff's Office. (Weekley depo. pp. 9-10).

Other officers, in addition to the plaintiffs in this case, have alleged that they were discriminated

against or retaliated against for making complaints of discrimination. (McCann depo., Simms depo.).

## LEGAL ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.

The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841

(11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## II. Claims against Mobile County Commission

### A. § 1983

All of plaintiffs' claims concern the operation of the Sheriff's Department either in its law enforcement capacity or in its capacity for operation of the jail.  A county is liable under § 1983 for actions of its sheriff that constitute county "policy." McMillian v. Monroe County, 520 U.S. 781, 783 (1997) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 694 (1978).  Whether the sheriff's actions constitute county policy depends on whether the sheriff is a final policymaker for the county in that particular area, or on that particular issue. Id. at 785.  The Supreme Court of the United

11

States determined in <u>McMillian</u> that under Alabama law,[1] a sheriff acting in his law enforcement capacity is not a policymaker for the county." <u>Id.</u> at 786.   As the Supreme Court noted, sheriffs are state officers and tort claims brought against sheriffs based on their official acts constitute suits against the State, not suits against the sheriff's county. <u>Id.</u> at 789. (citing <u>Parker v. Amerson</u>, 519 So.2d 442, 443-45 (Ala. 1987)).  Alabama counties are, therefore, not liable in tort under a theory of <u>respondeat superior</u> for a sheriff's official acts. <u>Id.</u> (citing <u>Parker</u>, 519 So.2d at 442).  The <u>McMillian</u> Court found that the facts that (1) the sheriff's salary is paid out of the county treasury, (2) the county provides the sheriff with equipment, supplies, lodging, and reimbursement for expenses, (3) the sheriff's jurisdiction is limited to the borders of his county, and (4) the sheriff is elected locally  do not "tip the balance in favor of [plaintiff]." <u>Id.</u> at 791.  As the Court explained:

> The county's payment of the sheriff's salary does not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely.  The county commissions do appear to have the discretion to deny funds to the sheriffs for their operations beyond what is "reasonably necessary." <u>See</u> <u>Etowah County Comm'n v. Hayes</u>, 569 So.2d 397, 399 (Ala. 1990) (per curium). But at most, this discretion would allow the commission to exert an attenuated and indirect influence over the sheriff's operations.

<u>Id.</u> at 791-92.

The <u>McMillian</u> Court further stated:

> Petitioner's contention that sheriffs are county officials because "state policymakers" typically make policy for the entire State (without limits on their jurisdiction) and are typically elected on a statewide (not local) basis, surely has some force.  But district attorneys and state judges are often considered (and in Alabama are considered) state officials, even though they, too, have limited jurisdictions and are elected locally.  These characteristics are therefore consistent with an understanding of the 67 Alabama sheriffs as state officials who have been locally placed throughout the State, with an element of control granted to the officials and residents of the county that receives the sheriff's services.
>
> In sum, although there is some evidence in Alabama law that supports petitioner's argument, we think the weight of the evidence is strongly on the side of the conclusion reached by the Court of appeals: Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties. <u>Cf.</u> <u>Praprotnik</u>, 485 U.S., at 125, 108 S.Ct., at 925 ("We are not, of course predicting that state law

---

[1] Whether a governmental official is a final policymaker is dependent on state law. <u>McMillian</u>, 520 U.S. at 783 (citations omitted).

> will always speak with perfect clarity"); <u>Id.</u>, at 126-127, 108 S.Ct., at 926 ("It may not be possible to draw an elegant line that will resolve this conundrum").

<u>Id.</u> at 792-93 (footnote omitted).  The <u>McMillian</u> Court also rejected the petitioner's argument that this conclusion will create a lack of uniformity in Alabama.  <u>Id.</u> at 794.  History "indicates that the common law itself envisioned the possibility that state law enforcement 'policies' might vary locally, as particular sheriffs adopted varying practices for arresting criminals or securing evidence."  <u>Id.</u> (footnote omitted). Thus, Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties.  Likewise, Alabama sheriffs who engage in the operation of a jail, represent the State of Alabama, not their counties.  <u>See</u> <u>Turquitt v. Jefferson County, Alabama</u>, 137 F.3d 1285, 1288 (11th Cir. 1998).  Therefore, the court finds that summary judgment is due to be granted in favor of Mobile County Commission as to plaintiffs' § 1983 claims

### B. Title VII

Under Title VII, a plaintiff may only prevail against a defendant who constitutes an "employer." The County Commission contends that it was not plaintiffs' employer for purposes of Title VII. Plaintiffs on the other hand, assert that Mobile County and Sheriff Tillman are plaintiffs' joint Title VII employers.[2]

> For Title VII purposes such an employer must be an individual or entity who extends a certain degree of control over the plaintiff. <u>See</u> e.g., <u>Magnuson v. Peak Technical Services, Inc.</u>, 808 F.Supp. 500, 507 (E.D.Va.1992).  A determination of whether a defendant is an "employer" subject to liability under Title VII requires an examination of defendant's role with respect to the right to hire, fire, transfer, promote, discipline, set the terms, conditions and privileges of employment, train and pay the plaintiff.  <u>See</u> e.g. <u>Ryals v. Mobile County Sheriff's Department.</u>, 839 F.Supp. 25, 26 (S.D.Ala.1993) ("Factors in determining whether separate entities exercise indicia of control and are thus joint employers includes whether the separate entities share or control certain aspects of the employee's employment such as (1) the authority to hire, transfer, promote, discipline or discharge; (2) the authority to establish work schedules or direct work assignments; or (3) the obligation to pay or the duty to train the employee.";  <u>Magnuson</u>, 808 F.Supp. at 507 ("In order to be subject to liability under Title VII, a defendant must (1) fall within Title VII's statutory definition of "employer," and (2) have exercised substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment.");  <u>Foster v. Township of Hillside</u>,

---

[2] Plaintiffs concede in their brief that no Title VII claims are asserted against defendant Mark Barlow.

780 F.Supp 1026, 1038, n. 4 (D.N.J. 1992).  Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important. Magnuson, 808 F.Supp. at 509.  Simply because an entity such as the Mobile County Commission is required under state law to pay the salaries of employees does not mean that such entity is the employer for purposes of liability under Title VII. Ryals, 839 F.Supp. at 26 (Mere fact that the County Commission cut the deputies' paychecks from funds annually budgeted for the Sheriff's Department did not mean that the Commission was the deputies' employer for Title VII purposes.); Hall v. Delaware Council on Crime & Justice, 780 F.Supp 241, 245 (D.Del.1992) ("[T]he funding of [any] non-profit organizations by the United Way does not justify the conclusion that the organizations are a single employer for the purposes of Title VII."); Warren v. Stone, 751 F.Supp. 1302, 1304 (N.D. Ill.1990) ("While Cook County is required to pay the salaries of employees of the Public Defender, ... the County serves no other role in their employment.")

Lee v. Mobile County Commission, 954 F.Supp. 1540, 1545-46 (S.D. Ala. 1995).  Plaintiffs admit that it is the sheriff who hires, fires, assigns, transfers, disciplines, and directs the deputies in their work. (Doc. 64 pp. 32-33).  Plaintiffs also note this court's decision in Lee, quoted at length above, and this court's similar decision in Ryals, cited above by Lee.  Plaintiffs point to this court's contrary opinion of Manley v. Mobile County, Alabama, 441 F.Supp. 1351 (S.D. Ala 1977), wherein the court held that Mobile County was a joint employer for Title VII purposes.  Plaintiffs also stress the fact that any judgment against the sheriff will have to be paid out of county funds.

The court finds that the more recent Lee and Ryals decisions have precedence over the contrary Manley decision.  Moreover, the Eleventh Circuit has clarified that the focus must be to determine which entity "is in control of the fundamental aspects of the employment relationship that gave rise to the claim." Lyes v. City of Riviera Beach, Florida, 166 F.3d 1332, 1345 (11th Cir. 1999). "Control of employment decisions and environment is one of the central features of the tests." Id. (citation omitted).  In this case, plaintiffs have not presented any evidence to suggest that the decisions from which plaintiffs' claims arise were made by the county commission.  The fact that funds to pay any judgment would come from the county does not demonstrate that the county exerts any control over plaintiffs, nor did it give rise to plaintiffs' claims.  The court finds that summary judgment is due to be granted as to plaintiffs' Title VII claims against Mobile County Commission.

14

## II. Merits of Plaintiffs' Retaliation and Discrimination Claims

All three plaintiffs contend that defendants retaliated against them either for filing a grievance or complaint alleging discrimination or for testifying in a civil lawsuit alleging discrimination.  Smith also claims that he was discriminated against on the basis of his race.  A  plaintiff may prove discrimination or retaliation by relying on either direct, circumstantial, or statistical evidence.[3]  See Walker v. Nationsbank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995) see also Wright v. Southland Corp., 187 F.3d 1287, 1305 (11th Cir. 1999) ("the same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the McDonnell Douglas presumption." citation omitted).    Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)).  As the U.S. District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlat[e] to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)).   None of the evidence submitted by plaintiffs qualifies as direct evidence of discrimination or retaliation. Although plaintiffs have offered evidence that derogatory language was used, there is no evidence that the statements of Sheriff Tillman, or other decision makers, correlated to the discrimination or retaliation complained of by plaintiffs.  None of the evidence offered proves without inference or presumption that the person who made the employment decisions did so as a result of a retaliatory motive.

---

[3] "The order and allocation of proof governing Title VII claims based on circumstantial evidence applies equally to similar claims of employment discrimination in violation of the equal protection clause raised pursuant to Section 1983." Morris v. Wallace Community College- Selma, 125 F.Supp.2d 1315, 1333 n. 16 (S.D. Ala. 2001) (citations omitted).

Plaintiffs may attempt to show discrimination and retaliation based on circumstantial evidence through the application of the McDonnell Douglas burden-shifting analysis established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, a plaintiff must first raise an inference of discrimination or retaliation by establishing a prima facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir.1997)).  In order to make out a prima facie case of discrimination, a plaintiff must show:

> (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997) (citations omitted).

Potts v. Conecuh-Monroe Counties Gas Dist.,  2000 WL 1229838, *17 (S.D. Ala. 2000).

To establish a prima facie case of retaliation based on circumstantial evidence, the plaintiff must show:

> (1) that he engaged in a statutorily protected expression;

> (2) he suffered an adverse employment action; and

> (3) there was a causal link between the adverse action and his protected expression.

Lucas v. W. W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001) (citations omitted).

Assuming for the purposes of argument that plaintiffs could establish a prima facie case, the burden would then shift to the defendants, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action.  The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280 (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotations omitted)).  If the defendants proffer a legitimate reason for the employment decisions, the burden then shifts back to plaintiffs, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. Id.   "At the pretext stage, in order to survive summary judgment, plaintiff[s] must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the

employer's decision." <u>Miller v. Bed, Bath & Beyond, Inc.</u>, 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing <u>Combs</u>, 106 F.3d at 1538).  Plaintiffs may do this  "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." <u>Id.</u> (citations omitted).  "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" <u>Hamilton</u>, 122 F. Supp.2d at 1281 (quoting <u>Combs</u>, 106 F.3d at 1539).  The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In satisfying the ultimate burden of proving that the adverse employment action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. <u>See</u> <u>Anderson v. Savage Laboratories, Inc.</u>, 675 F.2d 1221, 1224 (11th Cir. 1982) (citing <u>Haring v. CPC International, Inc.</u>, 664 F.2d 1234, 1239-40 (5th Cir. 1981)).  However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Chapman</u>, 229 F.3d at 1030 (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." <u>Chapman</u>, 229 F.3d at 1030.  An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1187 (11th Cir. 1984).

**A. James Crosby**

Crosby claims defendants retaliated against him for testifying in a civil case alleging discrimination.  It is undisputed that testifying in a civil case when subpoenaed is a statutorily protected expression.  Defendants strongly deny, however, that Crosby suffered an adverse employment action.  To be considered adverse under Title VII, an employment action must either be an ultimate

17

employment decision, such as a termination, failure to hire, or demotion, or "meet some threshold of substantiality." Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004) (citing Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1118 (11th Cir.2001)). "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." Shannon v. BellSouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir.2001)).

The court notes that the denial of lateral transfers are generally not considered to be adverse employment actions. See e.g. Gaddis v. Russell Corp., 242 F.Supp.2d 1123, 1145-46 (M.D. Ala. 2003)(denial of employee's transfer did not constitute an adverse employment action where there was no evidence that the position was a promotion, or otherwise entailed a significant difference in pay, benefits, or responsibilities); Smith v. Ala. Dep't of Corrections, 145 F.Supp.2d 1291, 1298 (M.D. Ala. 2001) (no adverse employment action where plaintiff proffered no evidence showing the position to which he sought a transfer was a promotion). As the Eleventh Circuit stated in Davis v. Town of Lake Park, Fla, 245 F.3d 1232, 1244 (11th Cir. 2001), "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." "The same concern exists for public entities such as the Town's Police Department, which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public." Id.

> "We do not suggest that a change in work assignments can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the 'terms, conditions, or privileges' of employment." 245 F.3d 1232, 1245 (11th Cir.2001) (quoting McNely v. Ocala Star-Banner Corp., 99 F.3d 1068 (11th Cir.1996)). Nevertheless, the Eleventh Circuit has instructed that lower courts should view work-reassignment discrimination claims with a jaundiced eye. The court cautioned that, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." Id. at 1244.

Portera v. State of Ala. Dept. of Finance, 322 F.Supp.2d 1285, 1298 (M.D.Ala.,2004).

18

Crosby maintained the same rank and pay.  Crosby was no longer allowed to attend Chief Barlow's Chief Deputy meetings, but Crosby was no longer reporting to Chief Barlow.  Crosby asserts that the new position did not include a secretary and entailed working in a smaller office with no window.  However, the office he was given was the same office occupied by the prior Captain of Support Services.  Likewise, the previous Captain of Support Services had no secretary.  Crosby also contends that his unmarked police car was replaced with a higher mileage, marked vehicle.  However, Chief Barbour, who Crosby does not assert retaliated against him in any way, was responsible for the assignment of vehicles.  Crosby asserts that the new position provided less opportunity for overtime.  However, Crosby was still allowed to participate in overtime when the need arose for his position.  Crosby has not demonstrated that others in his same position received more overtime.  The court finds that Crosby did not suffer an adverse job action.  Therefore, Crosby has not demonstrated a <u>prima facie</u> case.

Even if Crosby could establish a <u>prima facie</u> case,[4]  the court finds that defendants have

---

[4] As to the last prong, plaintiff can establish the requisite "causal link" required as part of a <u>prima facie</u> case, by merely establishing  that "the protected activity and the negative employment action were not completely unrelated." <u>E.E.O.C. v. Reichhold Chemicals, Inc.</u>, 988 F.2d 1564, 1571-72 (11th Cir. 1993) (This court has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (citation omitted).  Although defendants contend that because Tillman was ill, he did not attend the deposition at which Crosby testified and was therefore unaware of Crosby's testimony, the court nevertheless finds that there is sufficient evidence to support the causal link requirement of a <u>prima facie</u> case.  Viewing the facts in the light most favorable to plaintiff, and considering that Crosby testified in the former lawsuit about Tillman's actions and that his testimony could have impacted Tillman's liability in the then pending lawsuit, it is logical that Tillman would have been made aware of the general substance of Crosby's testimony.  The temporal proximity of Tillman's actions, together with the fact that it would be improbable that Tillman would not have known of Crosby's testimony, is sufficient, for the purpose of this <u>prima facie</u> analysis, to negate Tillman's claimed lack of knowledge.  <u>See</u> <u>Goldsmith v. City of Atmore</u>,  996 F.2d 1155, 1163 (11th Cir. 1993) ("The defendant's awareness of the protected statement, however, may be established by circumstantial evidence.").  The court finds that, based on the temporal proximity of the transfer and other actions, there was a sufficient causal link between the adverse action and Crosby's protected expression to support a <u>prima facie</u> case of retaliation, if, in fact, the employment action had been adverse.

proffered legitimate, non-discriminatory reasons for the employment action and that plaintiff has failed to demonstrate pretext.  As previously explained, once a prima facie case is demonstrated, the burden shifts to the defendants to proffer a legitimate, non-discriminatory reason for the adverse employment action.  According to Barlow, he transferred Crosby because he felt Crosby did not communicate well with him and was resistant to changes he was trying to implement.  Barlow states that there was nothing wrong  with Crosby's performance, but believes there was a communication problem which hindered their working relationship.  According to Barlow, the transfer made sense because the current Support Services Captain requested a transfer to Field Services and got along well with Chief Barlow, and because Crosby had experience in the civil division, was considering retirement, and got along well with Chief Barbour who was over that division.  Since defendants have proffered legitimate reasons for the employment decisions, the burden then shifts back to plaintiff, to show that the employer's proffered reasons are pretextual.

Although the court finds temporal proximity sufficient to establish a causal link, temporal proximity alone is insufficient evidence of pretext to survive summary judgment. Padron v. BellSouth Telecommunications, Inc.,  196 F.Supp.2d 1250, 1257 (S.D. Fla. 2002) ("Standing alone against Defendant's strongly supported legitimate reason for terminating [plaintiff], temporal proximity does not amount to more than a scintilla of evidence of retaliation."); Wellenbusher v. National Service Industries, Inc.,  2003 WL 23218084, *4 (S.D. Fla. 2003) ("Simply pointing out the fact that [plaintiff] was terminated soon after she announced her pregnancy does not meet the summary judgment requirement for specific facts showing that there is a genuine issue."); Swanson v. General Servs. Admin., 110 F.3d 1180, 1188 (5th Cir.), cert. denied, 522 U.S. 948, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997)("Close timing between an employee's protected activity and an adverse action against him may provide the "causal connection" required to make out a prima facie case of retaliation. However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive."); see also  Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir.1993); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278 (11th Cir.1997) (ADA); Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir.1996) (First Amendment retaliation); Dollar v. Shoney's,

20

Inc., 981 F.Supp. 1417, 1420 (N.D.Ala.1997) (FMLA); Dillon v. Carlton, 977 F.Supp. 1155, 1160 (M.D. Fla.1997) (FMLA), aff'd, 161 F.3d 21 (11th Cir.1998) (Table).   Crosby asserts that about five months after his transfer,  Tillman stated at a retirement party that "Captain Phillips was the good Captain, he kept his mouth shut."  Plaintiff contends that from this statement a jury could find that Tillman held a grudge against Crosby because of his testimony.  However, the court finds that this statement does not demonstrate pretext.  The statement makes no reference to Crosby, was not made immediately prior to or after Crosby testified and was made at a retirement party, where it was presumably intended to be humorous.

Plaintiff also asserts that this court should give little weight to Barlow's contention that he had difficulty communicating with Crosby because Barlow never documented any problem with Crosby or advised Crosby of any difficulty he had working or communicating with him, or of any incident when Crosby resisted Barlow's efforts to implement change.  However, Barlow did not assert that Crosby had violated an order or department rule.  Defendants have never contended that Crosby performed poorly.  As stated previously, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Communication, 738 F.2d 1181, 1187 (11th Cir. 1984).  The court notes that the employment action complained of in this case, a lateral transfer, is far less drastic than termination.  An employer would be expected to transfer an employee for a less serious reason than an employer might terminate an employee.   It is undisputed that Barbour and Cosby worked well together and, according to Barlow, that Barlow did not work well with Crosby.  Crosby has offered no evidence to dispute Barlow's contention, other than the fact that Barlow never disciplined Crosby.

Crosby also attempts to show pretext by asserting that other employees have been subjected to similar retaliation.  However, Crosby has not shown that these other employees were similarly situated or that either the sheriff or Barlow was involved in or aware of the retaliatory conduct.  The other employees had complaints against a former warden, Rick Gaston, and these employees were not deputy sheriffs, but instead worked at the Mobile County Metro Jail as corrections officers.   All of the alleged similar incidents occurred prior to defendant Mark Barlow's employment with the Sheriff's Office.  The court finds that Crosby has not shown that the proffered legitimate nondiscriminatory reason for transferring him is pretext or that a discriminatory reason more likely motivated the decision.

21

Therefore, summary judgment is due to be granted in favor of defendants as to Crosby's claims of retaliation.

### B. Jimmie Gardner

#### 1. Retaliation

Jimmie Gardner claims that he was retaliated against for filing an internal grievance on August 14, 2003, which alleged that the sheriff was discriminating against him because of his race.  It is undisputed that Gardner engaged in a statutorily protected expression when he filed his grievance.  Thus, Gardner has met the first prong of a prima facie case of retaliation.

As to the second prong, Gardner claims that defendants retaliated against him by investigating him and ultimately suspending him, failing to promote him,  transferring him from CID to patrol, and assigning him to the night shift when he requested light duty work.   Although being investigated is not an adverse employment action, being suspended clearly is adverse. See Pierce v. Tex. Dept. of Crim. Justice, Inst. Div., 37 F.3d 1146, 1150 (5th Cir.1994) (holding that threatening an employee to mind her own business, investigating her, videotaping her without her permission, and forcing her to take a polygraph, all in retaliation for employee's speech, were not adverse employment actions because they had no effect on the conditions of her employment, even though they may have had the effect of chilling her speech).

The failure to promote Gardner is also an adverse employment action.  Stavropoulos v. Firestone,  361 F.3d 610, 619 (11th Cir. 2004) ("We have defined which acts involve important conditions of employment by a list of examples. This list includes include discharges, demotions, refusals to hire or promote, and reprimands." citations omitted).  As for Gardner's transfer to patrol, the court finds that the transfer does not constitute an adverse employment action.  As discussed above concerning Crosby's transfer, work-reassignment discrimination claims are viewed "with a jaundiced eye." Portera, 322 F.Supp.2d at 1298 (discussing Davis, 245 F.3d at 1244).  "In unusual instances the change [in work assignments] may be so substantial and material that it does indeed alter the "terms, conditions, or privileges" of employment." Id. at 1298.  However, the court finds that Gardner has not shown that the transfer to patrol, where Gardner received the same salary, is so substantial and material

that it constitutes an adverse employment action.

Nor does Gardner's assignment to the night shift for light duty constitute an adverse action. Gardner was already assigned to the night shift at the time he presented a note from his doctor and requested light duty work. There is no evidence that Gardner requested or required a shift change. Gardner received exactly what he requested.

As noted above under Crosby's retaliation claim, plaintiff can establish the last prong, "causal link," by merely establishing that "the protected activity and the negative employment action are not completely unrelated." E.E.O.C., 988 F.2d at 1571-72 (citation omitted). The court finds that, based on the temporal proximity of the suspension and failure to promote and the protected activity, there was a sufficient causal link between the adverse action and Gardner's protected expression to support a prima facie case of retaliation.

Because Gardner has established all three prongs of a prima facie case of retaliation, the burden then shifts to the defendants to proffer a legitimate, non-discriminatory reason for the adverse employment action. As to Gardner's suspension, defendants contend that Gardner was disciplined because he disrupted the effective and efficient operations of the Sheriff's Office and failed to obey a direct order from a supervisor. Defendants contend that Gardner was not promoted to sergeant because of his recent suspension. Thus, defendants have proffered legitimate, non-discriminatory reasons for the decisions to suspend and to not promote Gardner.

Since defendants have proffered legitimate reasons for the employment decisions, the burden then shifts back to plaintiff to show that the employer's proffered reasons are pretextual. As previously stated in connection with Crosby's retaliation claim, although the court finds temporal proximity sufficient to establish a causal link, temporal proximity alone is insufficient evidence of pretext to survive summary judgment. Gardner asserts that other officers taped co-employees without the employees' knowledge, but were not disciplined. According to Gardner, Charlene Barton, a white female deputy, covertly taped former Chief Deputy Wilhelm, and forwarded the tape to the newspaper. Gardner's superior, Lieutenant Battiste, also testified during Gardner's Personnel Board hearing that he had taped

23

co-workers.  Neither Barton nor Battiste were ever disciplined.  However, Barton's taping of former

Chief Wilhelm, occurred over six years ago and uncovered Chief Wilhelm's disrespect for Sheriff

Tillman.  The covert taping appears to have been a one-time incident for which no supervisor brought

charges against Barton.  Battiste did not indicate in his testimony when or under what circumstances he

taped fellow officers.  No charges were ever brought to the sheriff's attention and a trial board was

never requested for Battiste.  In contrast, Gardner admits that he taped numerous co-workers and

supervisors over an extended period of time.  Gardner's supervisor, Captain Lee, brought the charges

against Gardner and requested a trial board.  The trial board reviewed the evidence and advised the

sheriff that Gardner had violated Sheriff Department policies. Sheriff Tillman simply followed the

recommendations made by the trial board.  The Mobile County Personnel Board upheld the sheriff's

decision to suspend Gardner, although it reduced the number of days of the suspension.   The fact that

the Personnel Board affirmed the decision is preclusive of any claim brought pursuant to 42 U.S.C. §

1983. Bishop v. City of Birmingham Police Dept., 361 F.3d 607, 610 (11th Cir. 2004); Crapp v. City

of Miami Beach, 242 F.3d 1017, 1022 (11th Cir. 2001).  That fact does not preclude Gardner's Title

VII claim. Id.  However,  Title VII requires the EEOC to give "substantial weight to final findings and

orders made by State or local authorities in proceedings commenced under State or local law." 42

U.S.C. § 2000e-5(b).  This court finds the Personnel Board's decision to be persuasive evidence that

Gardner's discipline was appropriate.  The court thus finds that plaintiff has not demonstrated that

defendants' reasons for disciplining Gardner are mere pretext.

     As to defendants' reasons for not promoting Gardner, the court also finds that Gardner has

failed to show pretext.  The majority of candidates that were promoted to sergeant were rated higher

than Gardner.  Four of those promoted were ranked lower than Gardner, however, none of the officers

promoted to sergeant had been suspended or similarly disciplined within the previous year.  Lieutenant

Lee, whom Gardner does not allege retaliated against him, recommended that Gardner not be

promoted due to Gardner having been suspended.  To show pretext in a failure to promote case, the

disparity in qualifications between the plaintiff and the persons promoted must be so apparent as to

virtually jump off the page and slap you in the face. Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001). Gardner has not demonstrated any great disparity in qualifications between himself and the four lower rated officers.

### 2. Racial Discrimination

It is undisputed that Gardner, as an African American, has met the first prong of a prima facie case of racial discrimination by being a member of a protected class. As discussed above, the court also finds that Gardner suffered adverse job actions when he was suspended and when he was not promoted. However, defendants contend that similarly-situated employees outside his classification were not treated more favorably. As discussed concerning Gardner's retaliation claim, the other officers who secretly taped co-workers were not similarly situated to Gardner. Unlike the circumstances of Gardner's taping, the other incidents were not shown to involve the taping of numerous co-workers over an extended period of time. In addition the other officers' supervisors did not bring charges or request a trial board for the incidents.

As to Gardner's failure to promote claim, a prima facie case can be shown by demonstrating that Gardner, as a member of a protected class, who was qualified and applied for the promotion, was rejected, while other equally or less qualified employees who were not members of the protected class were promoted. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004). The evidence shows that Gardner was qualified for the position and that other non-African American candidates who were less qualified were promoted. Thus, Gardner has demonstrated a prima facie case of discriminatory failure to promote.

As previously discussed, defendants have proffered a legitimate-nondiscriminatory reason for not promoting Gardner. The burden then shifts to Gardner to demonstrate that the proffered reason is merely pretext. As discussed in relation to Gardner's retaliation claim, the majority of candidates that were promoted were rated higher than Gardner, and Gardner has not demonstrated any great disparity in the qualifications between himself and the white lower ranked officers that were promoted. However, Gardner also asserts that there is substantial evidence that Tillman harbors racial animus

25

against African-Americans.  Namely, Gardner alleges that he heard Tillman (1) refer to a black male citizen as "just another dumb-ass nigger," (2) tell Gardner that "I'll get you niggers later," and (3) "joke" about placing a Confederate bumper sticker on the back of a black man's car, who rode around with that sticker on his car all day.  Other officers have also heard Tillman use inappropriate language when referring to African Americans.  The court finds that Gardner has provided sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not the true motivation for the employer's decision.  Thus, the court finds that summary judgment is not due to be granted as to Gardner's claim of discriminatory failure to promote.

### C. Willie (Omar) Smith

Smith seeks a declaration that he has been the victim of race discrimination and retaliation, and requests equitable relief in the form of a county-owned vehicle for his use. (Plaintiff's brief p. 30).  Smith's claim of retaliation and the reassignment of his vehicle was the subject of Smith's previous lawsuit which the parties settled.  Smith cannot reassert the same claims from his previously dismissed lawsuit.

To the extent Smith claims that he is being discriminated or retaliated against by not being assigned a county vehicle in his current position, the court finds Smith has not established a prima facie case.  Smith has not shown that he suffered an adverse employment action, nor has he shown that similarly situated employees outside his classification were treated more favorably.  There are no other captains of Corrections to act as comparators.  The previous captain of Corrections had a vehicle, however, the previous captain also acted as deputy warden.   Currently, there is a deputy warden in Corrections who has a vehicle.   Thus, the previous captain was not similarly situated.

Moreover, defendants have proffered a legitimate non-discriminatory reason for not providing Smith with a vehicle, and Smith has failed to show that the reason is merely pretext.  The Sheriff's Office has a shortage of vehicles and has been unable to provide vehicles to everyone that needs one.  Smith has not demonstrated that this legitimate nondiscriminatory reason is subject to question.

## III. Merits of Hostile Environment Claim

Gardner alleges that defendants' conduct created a hostile work environment.  According to

the Eleventh Circuit, a hostile work environment claim is established:

> upon proof that "the workplace is permeated with discriminatory intimidation, ridicule,
> and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's
> employment and create an abusive working environment."  Harris v. Forklift Systems,
> Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  This court has
> repeatedly instructed that a plaintiff wishing to establish a hostile work environment
> claim show:  (1) that he belongs to a protected group;  (2) that he has been subject to
> unwelcome harassment;  (3) that the harassment must have been based on a protected
> characteristic of the employee, such as national origin;  (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of employment and
> create a discriminatorily abusive working environment;  and (5) that the employer is
> responsible for such environment under either a theory of vicarious or of direct liability.
> See, e.g.,  [Mendoza v. Borden, 195 F.3d 1238,1245(11th Cir. 1999)] (applying
> these factors in the context of a hostile environment sexual harassment claim).

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  There is no dispute that

Gardner, as an African American, is a member of a protected group.  As to the second criteria of a

prima facie case, the court finds that plaintiffs have offered sufficient testimony indicating that they have

been subjected to some unwelcome harassment to survive a motion for summary judgment.  As to the

third element, the court also finds that plaintiffs have produced sufficient evidence that the harassment

was racially based.

With regard to the fourth element, factors to consider include "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance."

Harris v. Forklift Sys. Inc., 510 U.S. 17, 22-23 (1993).  An analysis of this issue was stated by the

Eleventh Circuit Court of Appeals as follows:

> To succeed at trial with her hostile environment claim Edwards must demonstrate that
> the actions of the defendants altered the condition of the workplace, creating an
> objectively abusive and hostile atmosphere. Harris v. Forklift Sys., Inc., 510 U.S. 17, -
> ---, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993) ("When the workplace is
> permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently
> severe or pervasive to alter the conditions of the victim's employment and create an
> abusive working environment,' Title VII is violated.") (internal citations omitted).  For
> example, the racial slurs allegedly spoken by co-workers had to be so "commonplace,
> overt and denigrating that they created an atmosphere charged with racial hostility."

E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990).  In deciding whether a hostile environment was created factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work.  Harris, 510 U.S. at -- --, 114 S.Ct at 372. ... A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her. Busby, 931 F.2d at 785.

Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

Gardner claims that while he was assigned to the REACT Unit, Tillman referred to a black male citizen as "just another dumbass nigger."  In November 2002, while Gardner was working at the CID Southside, Tillman allegedly told Gardner "I'll get you niggers later."  Then in August 2003, Tillman allegedly "joked" about placing a Confederate bumper sticker on the back of a black man's car, who rode around with that sticker on his car all day.  There is evidence that other officers also heard Tillman use derogatory language.  Gardner also alleges that blacks are treated more harshly when it comes to disciplinary actions.  Lastly, Gardner points to the same conduct he alleges was retaliatory that is discussed above concerning his retaliation claim.

Gardner only points to three derogatory statements or "jokes" which occurred over a period of several years.  While such statements may have been offensive, they can hardly be said to be pervasive. They certainly did not create an atmosphere charged with racial hostility.  As to any additional statements allegedly made by Tillman and heard by other officers, Gardener has not shown that they affected Gardner's work environment.  Gardner only heard the three statements. Having reviewed the evidence concerning differential treatment of blacks when disciplined, the court also finds that there is insufficient evidence that any differential treatment was pervasive or severe.

Gardner also alleges that anyone who opposes unlawful practices, complains about discrimination, or provides testimony unfavorable to the administration is subjected to retaliation. However, such assertions do not support a hostile work environment claim which concerns the harassment of members of a protected class.  The alleged discrimination is against all classes of persons who engage in a statutorily protected action.  Such allegations are more appropriately addressed under a claim of retaliation.

The court finds that the alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Gardner's employment and create a discriminatorily abusive working environment.

## IV. Claims Against the Mobile County Personnel Board

The Mobile County Personnel Board did not file a motion for summary judgment or join in the summary judgment motions filed by the other defendants.   The amended complaint states that the Personnel Board "is included as a necessary party to this action."  (Doc. 30, ¶ 37).  According to the complaint, the Personnel Board "is a final decision maker for employee discipline, and is a necessary party for any claim which involves an increase in pay and/or change in benefits or compensation to any employee of the Mobile County Sheriffs Office." (Doc. 30, ¶ 37).  It would appear that the court's conclusion that summary judgment is due to be granted as to all but one claim against all other defendants would mean that those same claims are due to be dismissed as against the Mobile County Personnel Board.  The Personnel Board is no longer a "necessary party" as to those claims.   The court finds it appropriate to order plaintiff to clarify its position regarding its claims against the Mobile County Personnel Board in light of the court's rulings on the motions for summary judgment.

## CONCLUSION

For the above stated reasons:

1. Summary judgment is **GRANTED** in favor of Mobile County Commission.

2. Summary judgment is **GRANTED** in favor of defendants Jack Tillman and Mark Barlow as to all claims asserted by James Crosby and Willie (Omar) Smith.

3. Summary judgment is **GRANTED** in favor of defendants Jack Tillman and Mark Barlow as to Jimmie Gardner's claim of retaliation.

4. Summary judgement is **DENIED** as to Jimmie Gardner's claim of discriminatory failure to promote, but **GRANTED** as to all other claims of discrimination asserted by Jimmie Gardner against Jack Tillman and Mark Barlow.

   5. Plaintiffs are ordered to file **on or before September 23, 2005**, a response to this order regarding the status of their claims against the Mobile County Personnel Board.  If the Mobile County Personnel Board deems it necessary to reply, they must do so **on or before September 30, 2005.**

**DONE** and **ORDERED** this 15th day of September, 2005.

                                             /s/ Callie V. S. Granade
                                             CHIEF UNITED STATES DISTRICT JUDGE